DA 08-0137

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 450

STATE OF MONTANA,

Plaintiff and Appellee,

v.

JASON LEE SCHMIDT,

Defendant and Appellant.

APPEAL FROM:   District Court of the Second Judicial District,
In and For the County of Silver Bow, Cause No. DC-07-38
Honorable Brad Newman, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Joslyn Hunt, Chief Appellate Defender; Roberta R. Zenker, Assistant
Appellate Defender; Helena, Montana

For Appellee:

Hon. Steve Bullock, Montana Attorney General; Mark W. Mattioli, Assistant
Attorney General; Helena, Montana

Eileen Joyce, Silver Bow County Attorney; Samm Cox and Molly Maffei,
Deputy County Attorneys; Butte, Montana

Submitted on Briefs:  September 23, 2009

Decided:  December 31, 2009

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Jason Lee Schmidt (Schmidt) appeals his conviction in the Second Judicial District Court, Silver Bow County, for mitigated deliberate homicide. We affirm.

¶2 We review the following issues on appeal:

¶3 *Did the jury instructions and verdict form at trial render Schmidt's conviction for mitigated deliberate homicide a "legal impossibility" under Demontiney?*

¶4 *Did the District Court properly deny Schmidt's request for a lesser included offense instruction?*

¶5 *Did the District Court properly deny Schmidt's motion to suppress evidence of his confession?*

¶6 *Did the District Court properly deny Schmidt's motion in limine to allow evidence that the victim had wielded a knife?*

¶7 *Did the District Court properly deny Schmidt's request for a mistrial?*

¶8 *Did the District Court properly exclude a photograph of the victim offered by Schmidt?*

¶9 *Did the District Court properly deny Schmidt's motion for a directed verdict?*

¶10 *Did the District Court properly instruct the jury on weapons enhancement?*

¶11 *Did the District Court properly impose restitution for the victim's funeral expenses?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶12 James Correia (Correia) died from stab wounds outside the Irish Times bar in Butte on March 24, 2007. Correia had gone to the Irish Times with his friend Chase Hanley

(Hanley). Correia and Hanley arrived at the Irish Times at approximately 12:30 a.m. Correia and Hanley earlier had visited three other bars. Correia was visiting from out of town and told Hanley that he wanted to see the "bad places" in Butte.

¶13 Schmidt arrived at the Irish Times around midnight with his wife, his brother, and a group of friends. The group had visited several bars en route. They had been celebrating Schmidt's wife's birthday.

¶14 Gunnar Fitzpatrick (Fitzpatrick) was working as the bartender and bouncer that night at the Irish Times. Fitzpatrick noticed Correia immediately because of the way he was moving and interacting with the other patrons. Fitzpatrick left his position behind the bar more than once to "defuse" potential altercations between Correia and other patrons. Fitzpatrick ultimately asked Correia and Hanley to leave.

¶15 Fitzpatrick also had to intervene in an argument between two women. Correia got involved in an altercation with the two women as he and Hanley were leaving. Hanley claimed that one of the women slapped Correia, and that, in response, Correia had pulled her hair and caused her to fall. Schmidt's wife claimed that Correia punched her in the face. Another witness corroborated Schmidt's wife's claim, but added that Schmidt's wife had slapped Correia first.

¶16 Accounts differ as to who instigated the confrontation, who was involved, and what Correia did. Most of the witnesses had been drinking. Many were unclear about what they saw. All the witnesses agreed that a brawl involving a number of people took place. Will Smith (Smith), a witness who was at the Irish Times, testified that Schmidt's brother had

3

tried to assault Correia. Smith tried to hold Schmidt's brother away from Correia, but two women grabbed Smith by the hair to make him let go. Smith testified that both Schmidt and his brother were trying to fight Smith in the middle of the bar. Bouncers broke up the fight and threw them out.

¶17 Fitzpatrick saw Correia at the center of the fight. Correia had Schmidt in a headlock and was "throwing uppercuts at him." Fitzpatrick attempted to break up the fight. Schmidt threw a punch that hit Fitzpatrick on the shoulder. Fitzpatrick finally separated the two men. Schmidt continued to yell profanities at Correia. Fitzpatrick escorted Correia and Schmidt outside. Correia gestured at one of the bouncers as though to challenge him to a fight.

¶18 Smith testified that Correia was "trying to stay neutral" outside the bar. Correia and Hanley backed toward their car, but two of the women from the bar followed them. Correia and the women continued to yell at each other. Correia took off his shirt and attempted to hit one of the women with it. The second woman responded by shoving Correia. Correia hit her.

¶19 Schmidt saw this exchange and "tried to assault" Correia. Schmidt claimed that when he saw Correia hit the woman, he called Correia "a piece of shit," and that Correia had responded by attacking him. Correia and Schmidt started fighting. The fight quickly devolved "into something of a glorified wrestling match." Neither fighter had the upper hand as both Schmidt and Correia were merely "jockeying for position."

¶20 Correia was on top of Schmidt. Schmidt pulled a knife out of his right front pocket, flipped it open, and stabbed Correia in the leg. Schmidt stabbed Correia three more times,

4

once in the lower abdomen, and twice in the chest. Schmidt stabbed with such force that the hilt of the knife left abrasions on Correia's skin. Schmidt's knife blade penetrated Correia's diaphragm and his heart. Correia climbed off Schmidt. He stood for a moment before limping toward Hanley.

¶21 Correia held his right side as he walked. Correia collapsed. Hanley noticed Correia's wounds and saw lots of blood. Someone applied pressure to Correia's wounds with a tee shirt. Another person called 911. The responding officer called for medical backup. The officer accompanied Correia to the hospital. Correia died shortly after arriving at the emergency room.

¶22 Schmidt came at Smith with a knife after Schmidt and Correia had stopped fighting. Smith ducked out of the way and took off. Zachary Hayes knew Schmidt from high school and was at the Irish Times. Hayes saw Schmidt pacing back and forth in the alley, and heard him swearing. Schmidt fled down the alley as Hayes approached him. Schmidt threw the knife into a dumpster and ran toward Butte High School. A friend called Schmidt on his cell phone and picked him up near the school. Schmidt threw his cell phone out the car window. Schmidt burned his bloody clothes in a wood stove when he got home. Schmidt took a shower, grabbed another knife, and went for a drive.

¶23 Schmidt initially denied any wrongdoing to police. He eventually admitted to stabbing Correia. Schmidt claimed that Correia had him pinned and was striking him repeatedly. Schmidt stated that he was afraid Correia was going to kill him. Schmidt claimed that he was trying to defend himself. Schmidt lied to the officers about his clothes.

5

He told the officers that they would find the clothing that he had been wearing during the fight in his bedroom, along with the knife that he had been carrying. In fact, he had burned the clothes in his woodstove and he had thrown the knife into a dumpster.

¶24 Schmidt moved to suppress evidence of his confession and evidence obtained during a search of his home. Schmidt claimed that police officers had given him deficient *Miranda* warnings. Schmidt also moved for a new trial in response to a potential juror's comment about a witness for the defense. Schmidt argued that the potential juror's comment had tainted the jury panel. The District Court denied Schmidt's motions.

¶25 The District Court issued thirty-three jury instructions during the trial. The court instructed the jury to consider any mitigating factors at the same time that it considered whether the State had established all of the elements of deliberate homicide. The court also instructed the jury on the lesser included offense of mitigated deliberate homicide at Schmidt's request. The court used a verdict form similar to one Schmidt had proposed. The jury convicted Schmidt of mitigated deliberate homicide following a seven day trial. The jury indicated on the verdict form that it found Schmidt not guilty of deliberate homicide. The District Court imposed a sentence that included a weapons enhancement. The court suspended the weapons enhancement in exchange for Schmidt's having agreed to pay $24,347.18 in restitution to Correia's family.

**STANDARD OF REVIEW**

¶26 We review a district court's jury instructions to determine whether the instructions, as a whole, fully and fairly instruct the jury on the applicable law. *State v. Hudson*, 2005 MT

6

142, ¶ 10, 327 Mont. 286, 114 P.3d 210. The district court has broad discretion in formulating jury instructions. *Hudson*, ¶ 10. The instructions must prejudicially affect the defendant's substantial rights to constitute reversible error. *Hudson*, ¶ 10.

¶27 We review for clear error a district court's denial of a motion to suppress evidence. *State v. Thomas*, 2008 MT 206, ¶ 9, 344 Mont. 150, 186 P.3d 864. We review for an abuse of discretion a district court's grant or denial of a motion in limine. *Tin Cup County Water v. Garden City Plumbing & Heating, Inc.*, 2008 MT 434, ¶ 46, 347 Mont. 468, 200 P.3d 60. We review for abuse of discretion a district court's denial of a motion for a mistrial. *State v. Dubois*, 2006 MT 89, ¶ 33, 332 Mont. 44, 134 P.3d 82. We review for abuse of discretion a district court's evidentiary ruling. *State v. Damon*, 2005 MT 218, ¶ 12, 328 Mont. 276, 119 P.3d 1194.

¶28 We review *de novo* a district court's denial of a motion for a directed verdict. *State v. Marler*, 2008 MT 13, ¶ 20, 341 Mont. 120, 176 P.3d 1010. We review *de novo* the legality of a sentencing condition. *State v. Park*, 2008 MT 429, ¶ 14, 347 Mont. 462, 198 P.3d 321. We review for legality only a sentence that includes at least one year of incarceration. *State v. Perkins*, 2009 MT 150, ¶ 8, 350 Mont. 387, 208 P.3d 386.

## DISCUSSION

¶29 *Did the jury instructions and verdict form at trial render Schmidt's conviction for mitigated deliberate homicide a "legal impossibility" under Demontiney?*

¶30 A person commits the offense of mitigated deliberate homicide when they satisfy all of the elements necessary for deliberate homicide "but [do] so under the influence of extreme

7

mental or emotional stress for which there is reasonable explanation or excuse." Section 45-5-103(1), MCA. Schmidt argues that the jury's acquittal on the charge of deliberate homicide and conviction of mitigated deliberate homicide created a "legal impossibility" that requires his immediate release from custody.

¶31 This Court determined a similar result to be "truly legally inconsistent" in *Demontiney v. Mont. Twelfth Judicial Dist. Court*, 2002 MT 161, 310 Mont. 406, 51 P.3d 476. The State charged Demontiney with deliberate homicide. The district court instructed the jury on mitigated deliberate homicide over Demontiney's objection. *Demontiney*, ¶ 5. The district court instructed the jury first to consider the charge of deliberate homicide. Jurors were to consider the lesser charge of mitigated deliberate homicide only if they reached a verdict of not guilty, or were unable to agree, on the greater charge. *Demontiney*, ¶ 7. The jury entered a verdict of not guilty to deliberate homicide and guilty to mitigated deliberate homicide. Demontiney argued that the jury's verdict was "truly legally inconsistent." *Demontiney,* ¶ 8.

¶32 This Court reasoned that "a finding of guilty on mitigated deliberate homicide requires a finding of every element of deliberate homicide plus an additional finding of extreme mental or emotional stress." *Demontiney*, ¶ 20. Both the jury instructions and the verdict form directed the jury to consider the lesser charge only if the jury found the defendant not guilty of the greater charge. *Demontiney*, ¶ 7. This Court assumed that the jury first acquitted Demontiney on the deliberate homicide charge and concluded that there was "no logical way the jury could *acquit* on deliberate homicide and then consider mitigated deliberate homicide." *Demontiney*, ¶ 16 (emphasis in original). The jury's

8

acquittal on the charge of deliberate homicide precluded a conviction on mitigated deliberate homicide. *Demontiney*, ¶ 24.

¶33    Justice Leaphart agreed that the district court's instruction incorrectly applied the law. *Demontiney*, ¶ 32 (Leaphart, J. dissenting). He argued, however, that Demontiney had not been prejudiced by this error. *Demontiney*, ¶ 33 (Leaphart, J. dissenting). Justice Leaphart pointed out that the jury's not guilty verdict to the offense of deliberate homicide did not necessarily mean that Demontiney had not committed all of the elements of deliberate homicide. *Demontiney*, ¶ 35 (Leaphart, J. dissenting). The jury likely simply determined that Demontiney had committed all of the elements of deliberate homicide while acting under extreme mental or emotional stress. *Demontiney*, ¶ 35 (Leaphart, J. dissenting). The Court could not discern from the verdict form whether the jury first had acquitted Demontiney of deliberate homicide, or whether the jury first had convicted Demontiney of mitigated deliberate homicide. *Demontiney*, ¶ 35 (Leaphart, J. dissenting). The Court rejected this argument on the basis that the jury instructions incorrectly directed the jury to consider first the more serious deliberate homicide charge. *Demontiney*, ¶ 19.

¶34    The District Court did not commit the same error in this case. The court's jury instruction on mitigated deliberate homicide directed the jury to consider whether Schmidt had committed all of the elements of deliberate homicide while acting under the influence of extreme mental or emotional stress. If the jury found that Schmidt had committed all of the elements of deliberate homicide without the mitigating circumstance of extreme mental or emotional stress, it was to find Schmidt guilty of deliberate homicide. The court's

9

instruction differed functionally from Schmidt's in that it omitted the concluding direction first to consider the verdict on the greater offense, and to consider mitigated deliberate homicide only if it were unable to reach a verdict on deliberate homicide. Schmidt's proposed instruction erroneously would have directed the jury first to consider the deliberate homicide charge. Schmidt's proposed instruction further would have directed the jury to consider mitigated deliberate homicide only if the jury were unable to reach a verdict on deliberate homicide. Schmidt's proposed instruction thus created precisely the type of issue that this Court addressed in *Demontiney*. The District Court avoided this potential pitfall by formulating its own instruction.

¶35 The District Court's correct instruction must be distinguished from the verdict form proposed by Schmidt and adopted by the court. Unlike the District Court's jury instruction, the verdict form directed the jury to enter a verdict for mitigated deliberate homicide only if it first found Schmidt not guilty of deliberate homicide. Schmidt's challenge thus arises solely from the form on which the jury entered its verdict. The verdict form instructed the jury to skip the charge of mitigated deliberate homicide if the jury entered a verdict of "guilty" to the charge of deliberate homicide. If the jury entered a verdict of "not guilty" to deliberate homicide, however, the verdict form directed the jury to enter a verdict for the charge of mitigated deliberate homicide. The verdict form was functionally the same as the form offered by Schmidt.

¶36 Schmidt failed to object to the verdict form. Indeed, Schmidt argued at sentencing that the jury's verdict provided "credibility" to the evidence of mitigation. Schmidt first

10

objected to the alleged inconsistency in the verdict form when he filed his petition for a writ of supervisory control four months after he had filed his notice of appeal. Schmidt cannot create error for his own benefit on appeal. *Cline v. Durden*, 246 Mont. 154, 162, 802 P.2d 1077, 1082 (1990).

¶37 This Court in *Demontiney* stated that "[w]e cannot imagine a much more prejudicial result to a defendant than a guilty verdict that is not logically possible." *Demontiney*, ¶ 21. The same does not hold true here. The court correctly instructed the jury on mitigated deliberate homicide in spite of Schmidt's proposed erroneous instruction. We must presume that the jury followed the court's instruction. *Malcolm v. Evenflo Co.*, 2009 MT 285, ¶ 103, 352 Mont. 325, 217 P.3d 514.

¶38 Schmidt now attempts to create a *Demontiney* issue from the verdict form that he proposed. As noted by Justice Leaphart in *Demontiney*, we cannot discern definitively whether the jury first acquitted Schmidt of deliberate homicide, or first convicted Schmidt of mitigated deliberate homicide. *Demontiney*, ¶ 35 (Leaphart, J. dissenting). The Dissent, in rejecting this conclusion, conflates the District Court's jury instruction with the directions on the verdict form. In *Demontiney*, both the verdict form and the jury instructions directed the jury to consider mitigated deliberate homicide only if it first acquitted the defendant, or was unable to reach a verdict of deliberate homicide. The Dissent ignores the functional difference here by focusing on the erroneous verdict form rather than the fact that, unlike in *Demontiney*, the District Court correctly instructed the jury. This Court in *Demontiney* was concerned primarily with "the District Court's erroneous instructions, not with the jury's

11

efforts to grapple with those erroneous instructions." *Demontiney*, ¶ 19. The District Court in this case correctly instructed the jury to consider mitigating circumstances concurrently with the elements of deliberate homicide. We must assume that the jury followed those instructions. *Evenflo*, ¶ 103. This assumption holds true here, where Schmidt provided the erroneous verdict form, but the court actually instructed the jury correctly. We have no basis from which to determine that the jury followed the directions on the verdict form to the exclusion of the instruction provided by the District Court.

¶39    The Dissent further contends that the legislature has confused the state of the law with regard to the crime of mitigated deliberate homicide. The Dissent raises valid concerns, but it is not this Court's job to write the law – rather we must apply it as written. We note nonetheless that the verdict form suggested by the Dissent would obviate *Demontiney*-type problems pending a legislative fix.

¶40    We further recognize that Schmidt proposed a verdict form that contained functionally the same wording as the one he now claims resulted in a "legal impossibility." Schmidt may not now claim prejudice from that form that he proposed. *Cline*, 246 Mont. at 162, 802 P.2d at 1082. The Court in *Demontiney* presumed prejudice from the ambiguous verdict form due to the erroneous jury instructions. *Demontiney*, ¶ 19. We decline to presume prejudice from this verdict form in light of the fact that the District Court correctly instructed the jury. We cannot determine under these circumstances that the verdict form presented by Schmidt, and adopted by the court, substantially prejudiced Schmidt. *State v. Scarborough*, 2000 MT 301, ¶ 85, 302 Mont. 350, 14 P.3d 1202.

12

¶41 *Did the District Court properly deny Schmidt's request for a lesser included offense instruction?*

¶42 Schmidt argues that the District Court improperly refused his proposed jury instructions on assault with a weapon, aggravated assault, and criminal endangerment, as lesser included offenses of deliberate homicide. Schmidt cites *State v. Castle*, 285 Mont. 363, 948 P.2d 688 (1997), and *State v. Sellner*, 286 Mont. 397, 951 P.2d 996 (1997), for the proposition that assault represents a lesser included offense of deliberate homicide. A court must provide a lesser included offense instruction when one of the parties requests it *and* the jury rationally could find the defendant guilty of the lesser included offense. *Castle*, 285 Mont. at 369, 948 P.2d at 691; § 46-16-607(2), MCA.

¶43 The victim in *Castle* had been beaten severely before he was stabbed to death. Castle confessed that he had punched the victim three times in the jaw and once in the side of the head. Castle claimed, however, that the victim had been standing when he left the room. Castle returned to the room to find the victim on the floor. Castle claimed that he watched as another defendant stabbed the victim repeatedly. *Castle*, 285 Mont. at 366, 948 P.2d at 689.

¶44 This Court determined that Castle's testimony and the medical evidence established a factual basis from which a jury rationally could have found Castle guilty of assault, rather than guilty of homicide. Castle's theory posited that someone other than Castle had been responsible for the victim's death. *Castle*, 285 Mont. at 370, 948 P.2d at 692. The Court

concluded that the trial court should have given Castle's proffered jury instruction on assault as a lesser included offense. *Castle*, 285 Mont. at 370, 948 P.2d at 692.

¶45   This Court in *Sellner* rejected the defendant's argument that an instruction for aggravated assault should have been given where the defendant intentionally shot a police officer. *Sellner*, 286 Mont. at 399, 951 P.2d at 997. The officer had stopped Sellner's car to question Sellner in connection with an assault Sellner allegedly had witnessed. The officer had been unaware that Sellner had not paid his federal income taxes for nearly twenty years, had no driver's license, and as a result had an aversion to law enforcement officers. Sellner jumped out of the car and fled. The officer shouted for Sellner to stop. Sellner instead shot the officer in the chest. The officer survived his injuries only because he had been wearing a bulletproof vest. *Sellner*, 286 Mont. at 399, 951 P.2d at 997.

¶46   Sellner argued that his trial counsel should have requested a jury instruction on aggravated assault as a lesser included offense of attempted deliberate homicide. *Sellner*, 286 Mont. at 398, 951 P.2d at 996. This Court distinguished *Castle*. The evidence presented in *Castle* raised the possibility that injuries inflicted by persons other than the defendant had caused the victim's death. *Castle*, 285 Mont. at 370, 948 P.2d at 692. The Court emphasized that Sellner admitted to being the sole cause of the victim's injuries. *Sellner*, 286 Mont. at 402, 951 P.2d at 999. The evidence in Sellner's case did not support the giving of an aggravated assault instruction. *Sellner*, 286 Mont. at 403, 951 P.2d at 999.

¶47   Schmidt argues that the facts of his case fall somewhere in the middle of the spectrum delimited by *Castle* and *Sellner*. Schmidt maintains that a jury rationally could have found

14

him guilty of the lesser included offense of aggravated assault. Schmidt concedes that no dispute exists that any person other than Schmidt caused Correia's injuries. Schmidt admits to having inflicted the wounds that caused Correia's death. Schmidt argues, however, that significant evidence supports his claim that he had not intended to cause Correia's death.

¶48 Schmidt's case falls squarely on the *Sellner* end of the spectrum. Schmidt relies on his own testimony and Correia's allegedly threatening appearance and behavior to bolster the argument that Schmidt had not intended to kill Correia. The fact remains, however, that Schmidt, like Sellner, admits to having been the sole cause of the victim's injuries. Schmidt admits that he stabbed Correia. Schmidt does not claim that anyone else was involved. Correia died from his injuries.

¶49 A person commits aggravated assault if they "purposely or knowingly [cause] serious bodily injury to another or purposely or knowingly, with the use of physical force or contact [cause] *reasonable apprehension* of serious bodily injury or death in another." Section 45-5-202(1), MCA (emphasis added). By definition, aggravated assault does not include death. Once a death results, homicide is implicated. A jury properly instructed on the elements of aggravated assault rationally could not find Schmidt guilty of aggravated assault in light of the fact that Correia died from wounds inflicted solely by Schmidt. The fact that aggravated assault constitutes a lesser included offense of deliberate homicide proves insufficient, by itself, to satisfy the statutory requirement for a lesser included offense instruction. A jury would not have been warranted in finding Schmidt guilty of aggravated assault based on the evidence presented. Section 46-16-607, MCA.

15

¶50     *Did the District Court properly deny Schmidt's motion to suppress evidence of his confession?*

¶51     Schmidt argues that he gave his confession and consent to a search in response to deficient *Miranda* warnings. Schmidt first attacks the notification of rights form used by the officers. Schmidt claims that the form's wording implied that his right to counsel applied solely to judicial proceedings and did not extend to police interrogations. Schmidt next argues that the interviewing detective should have ascertained whether Schmidt understood his rights. Schmidt claims that the detective should have asked him explicitly whether he wished to be interviewed without counsel present. Finally, Schmidt maintains that the cursory manner in which the officer read the *Miranda* warnings failed to enable Schmidt to understand the consequences of waiving his rights. Schmidt claims that the sixteen seconds that it took the officer to read him his rights constituted "mere lip service" to *Miranda*.

¶52     Detective Edward "Butch" Harrington testified at trial that he gave Schmidt a copy of the notification form. Detective Harrington read Schmidt his rights before questioning him. The video of Schmidt's interrogation depicts Detective Harrington reciting the *Miranda* warning to Schmidt in the presence of another officer. Detective Harrington summarized Schmidt's rights, stating:

> What I read ya, this breaks it down six ways (reading) 'you have the absolute right to remain silent.' If you read and if you can understand it and are comfortable with that, I'm just going to ask that you initial it. That's all it is, is your rights. It's not an admission or anything like that.

Schmidt examined the form, signed it, and handed it back to the detective. Schmidt specifically initialed six separate rights, including the right to have counsel present during

16

questioning. Schmidt signed and dated the form.

¶53 The District Court twice viewed the recording of the interrogation. The court observed that the detectives had not used coercion or other improper investigative techniques. The detectives, on the contrary, were respectful, spoke in calm voices, and allowed Schmidt breaks during the interview. The detectives did not make any promises to Schmidt in exchange for his statement. The District Court noted that although Detective Harrington's recitation was brief, "[t]he recording depicts an adult suspect who appears to understand the nature and consequences of the interview process, including his waiver of rights." Schmidt did not ask for counsel or assert his right to remain silent at any time during the interview.

¶54 The District Court also took into account Schmidt's demeanor during questioning. The court determined that Schmidt's ability to understand the officers' questions and to formulate appropriate responses supported the notion that Schmidt understood and voluntarily had waived his rights. The court further noted that the officers had prefaced their request to search Schmidt's house with a second and more extensive explanation of Schmidt's rights. The District Court properly denied Schmidt's motion to suppress.

¶55 *Did the District Court properly deny Schmidt's motion in limine to allow evidence that the victim had wielded a knife?*

¶56 Schmidt challenges the District Court's denial of his motion *in limine* to allow him to present testimony from a witness who claimed to have seen Correia with a knife in his hand earlier in the evening. Schmidt maintains that the testimony should have been admissible as

evidence of Correia's character. Schmidt did not seek to admit the evidence to show Correia's reputation for violence. Schmidt focused instead on Correia's prior conduct on the evening of the fight as having been relevant to demonstrate that the degree of force used by Schmidt had been reasonable.

¶57 Schmidt had not seen Correia holding the knife. The bouncer, Gunnar Fitzpatrick, was the only person to have seen Correia holding the knife. Correia complied when Fitzpatrick asked him to put away the knife. Schmidt never claimed that he had been aware that Correia had a knife before the fight. Whether Correia had brandished a knife earlier in the evening could have played no role, therefore, in Schmidt's calculation as to the amount of force to use against Correia. The District Court did not abuse its discretion in determining that testimony regarding Correia having had a knife earlier in the evening was not relevant to Schmidt's decision to use his own knife on Correia.

¶58 *Did the District Court properly deny Schmidt's request for a mistrial?*

¶59 Schmidt argues that the District Court committed structural error when it denied Schmidt's motion for a mistrial after a potential juror uttered a damaging comment about a defense witness. The State inquired during jury selection whether anyone knew a certain defense witness. One of the potential jurors responded by blurting out that the witness had raped her daughter. The District Court reasoned that the witness in question was not on trial. The court further observed that the proposed defense witness could not be impeached by a conviction for rape as it did not pertain to the witness's credibility.

18

¶60 The court reserved Schmidt's right to follow up with individual *voir dire* if the panelist who had made the remark was in a position to be seated on the jury. The court also gave Schmidt leave to bring the motion again "should further voir dire establish some kind of a general bias on the panel based on that one comment." Schmidt did not object to the District Court's resolution of the matter. Counsel for Schmidt enquired during *voir dire* whether anything had been said "regarding any of the witnesses that are going to testify that would cause [any member of the jury] any concern or problem?" None of the witnesses mentioned the non-seated panelist's remark. The court reserved Schmidt's right to renew the motion for a mistrial if any evidence of bias surfaced at a later time. None did. The District Court did not abuse its discretion by denying Schmidt's motion for a mistrial.

¶61 *Did the District Court properly exclude a photograph of the victim offered by Schmidt?*

¶62 The District Court denied Schmidt's request to introduce a photograph of Correia that depicted Correia's "intense" eyes. Schmidt argues that the District Court did not evaluate thoroughly the probative value of the photograph. Schmidt cites *State v. Dunfee*, 2005 MT 147, ¶ 26, 327 Mont. 335, 114 P.3d 217, for the proposition that a trial court must weigh the probative value of a photograph against its prejudicial effect to determine its admissibility. *See also* M. R. Evid. 403.

¶63 Our statement in *Dunfee* constitutes an application of Rule 403 to specific facts, rather than a general rule pertaining to photographic evidence. Courts apply the Rule 403 balancing test to determine whether relevant evidence should be excluded for reasons of

19

prejudice. *State v. Laird*, 225 Mont. 306, 312, 732 P.2d 417, 421 (1987); M. R. Evid. 403. Schmidt's argument skips the initial relevance determination.

¶64 The District Court determined that Schmidt had failed to make a sufficient showing that the photograph accurately reflected Correia's appearance on the night of the fight. Schmidt also had introduced two other photographs of Correia. These photographs depicted Correia without his shirt, flexing his muscles. The admitted photographs also showed Correia's eyes. Schmidt's counsel had questioned witnesses about Correia's appearance generally, and Correia's eyes in particular. The court observed that the photograph, in addition to being more than four years old, had not been taken in the bar or in Schmidt's presence. The court's determination that the photograph was not relevant precluded any need for it to proceed to the Rule 403 analysis. *See Laird*, 225 Mont. at 311, 732 P.2d at 421. The District Court did not abuse its discretion by denying its introduction. *Damon*, ¶ 12.

¶65 *Did the District Court properly deny Schmidt's motion for a directed verdict?*

¶66 Schmidt claims that the District Court erred by denying his motion to dismiss at the close of the State's case. A district court properly grants a motion for a directed verdict only when no evidence exists upon which a rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt, when viewing the evidence in a light most favorable to the prosecution. *Marler*, ¶ 20.

¶67 The record contains ample evidence upon which the jury could have found that Schmidt had committed the elements of deliberate homicide. *Marler*, ¶ 20. The precise

20

sequence of events on the night of Correia's death remains elusive. Many of the witnesses had been drinking or were involved in the fighting at the Irish Times. It is undisputed, however, that Schmidt stabbed Correia and caused his death. Schmidt then fled the scene of the fight. Schmidt threw away his knife and cell phone, went home, and burned his clothes. Schmidt lied to police about the clothing that he had been wearing and the knife that he had used. The District Court properly allowed the jury to make the determination of whether the State had presented sufficient evidence to convict Schmidt. *Marler*, ¶ 35.

¶68 *Did the District Court properly instruct the jury on weapons enhancement?*

¶69 A court may impose a penalty enhancement once a jury makes a unanimous finding of guilt as to the underlying crime. The jury then must make a separate, unanimous finding that the defendant committed the act that supports the enhancement. Section 46-1-401, MCA. The District Court instructed the jury on weapons enhancement in the context of deliberate homicide. The court did not instruct the jury separately on weapons enhancement with regard to mitigated deliberate homicide. Schmidt claims that the jury instruction became "the law of the case" under *State v. Crawford*, 2002 MT 117, 310 Mont. 18, 48 P.3d 706.

¶70 *Crawford* turned on a jury instruction that contained an extraneous element. The State's failure to object to the proposed jury instruction rendered the instruction the law of the case. *Crawford*, ¶ 27. The jury became bound by the instruction. The court's inclusion of this extraneous element in the jury instruction required the jury to find the extraneous element, in addition to finding all of the statutorily required elements. *Crawford*, ¶ 27.

21

¶71 The jury instruction that Schmidt challenges did not add or delete any elements of the underlying offense. The District Court considered this instruction in the context of all thirty-three jury instructions taken as a whole. *State v. Dasen*, 2007 MT 87, ¶ 34, 337 Mont. 74, 155 P.3d 1282. The jury instructions clearly stated that the charge of mitigated deliberate homicide required proof of all the same elements as deliberate homicide. The instructions also directed the jury to "consider all of the instructions as a whole, and . . . to regard each in light of all the others." The verdict form expressly directed the jury to answer the weapons enhancement inquiry if it found Schmidt guilty of mitigated deliberate homicide. The rule announced in *Crawford* has no application to these facts. The jury instructions, considered as a whole, fully and fairly instructed the jury on the applicable law. *Dasen*, ¶ 34.

¶72 *Did the District Court properly impose restitution for the victim's funeral expenses?*

¶73 Schmidt challenges the District Court's order that he pay restitution based on the failure of Correia's family to submit an affidavit substantiating the amount of their pecuniary loss. Section 46-18-242(1)(b), MCA, requires a victim to submit an affidavit describing and assigning a dollar amount to the victim's pecuniary loss. The trial court imposed restitution in the amount recommended by the probation officer in the pre-sentence investigation (PSI) report. The probation officer calculated restitution based on a written statement provided by Correia's family.

¶74 The restitution included Correia's funeral expenses and his family's travel expenses during trial and sentencing. Schmidt did not specifically contest the amount of restitution. Schmidt did object to the lack of an affidavit in his sentencing memorandum. Schmidt

22

offered no evidence or argument refuting the amount of restitution at the sentencing hearing. Schmidt did not claim that the restitution figure was unreasonable. Schmidt did not question the probation officer extensively. Schmidt did not insist on the need for an affidavit at the hearing. Schmidt also did not make use of the hearing to question the members of Correia's family who were present.

¶75 We recently upheld the affidavit requirement of § 46-18-242, MCA, in *State v. Hunt*, 2009 MT 265, 352 Mont. 70, 214 P.3d 1234. The State's failure to include an affidavit in the PSI report required remand to the district court for compliance with the statutory provisions. *Hunt*, ¶ 22. The defendant in *Hunt* objected at the sentencing hearing, however, to the lack of a sworn affidavit. Schmidt did not. Schmidt did not object to the amount, or calculation, of restitution at the sentencing hearing. Schmidt admitted in his sentencing memorandum and at the sentencing hearing that restitution was appropriate. Schmidt initially supported the PSI's recommendation that he pay restitution in exchange for suspension of the weapons enhancement sentence. Schmidt objected only after he received an unfavorable sentence. The District Court's imposition of restitution satisfies § 46-18-242, MCA.

¶76 Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH

23

/S/ JOHN WARNER

/S/ W. WILLIAM LEAPHART
/S/ JIM RICE

Justice James C. Nelson, dissenting.

¶77    I dissent.  I would hold that *Demontiney v. Twelfth Judicial Dist. Court*, 2002 MT 161, 310 Mont. 406, 51 P.3d 476, is dispositive and that the jury, having acquitted Schmidt of deliberate homicide (§ 45-5-102(1)(a), MCA), could not then logically find him guilty of mitigated deliberate homicide (§ 45-5-103(1), MCA).

¶78    In *Demontiney*, this Court reaffirmed that " 'a finding that the defendant satisfied the elements of deliberate homicide is a *prerequisite* to a conviction on the mitigated offense.' " *Demontiney*, ¶ 16 (quoting *State v. Scarborough*, 2000 MT 301, ¶ 48, 302 Mont. 350, 14 P.3d 1202) (emphasis in *Scarborough*).  As we observed, the contrary " 'would require finding, first, that the defendant *did not* "purposely or knowingly cause the death of another human being" and, second, that he *did so* but only under the influence of extreme mental or emotional stress.' " *Demontiney*, ¶ 16 (quoting *Scarborough*, ¶ 49) (emphases in *Scarborough*).  Thus, we held that "a finding of guilt on deliberate homicide is a precondition to a finding of guilt on mitigated deliberate homicide." *Demontiney*, ¶ 17.  We

24

noted that the State had conceded that this statutory interpretation is correct. *Demontiney*, ¶ 17.

¶79 Here, the Court affirms Schmidt's conviction of mitigated deliberate homicide on precisely the rationale which the Court rejected in *Demontiney* when reversing the same conviction in that case. Opinion, ¶¶ 32, 38. In reaching this result, the Court cites Instruction No. 25 (*see* Opinion, ¶¶ 34, 38), which first directed the jury to consider the evidence in terms of mitigated deliberate homicide and then directed the jury to consider the evidence in terms of deliberate homicide. Of course, the order in which the jury considered the two charges is beside the point, given that the jury subsequently acquitted Schmidt of deliberate homicide, as stated on the Verdict. The Court also observes that although the acquittal of deliberate homicide came in response to Question 1 on the verdict form and the conviction of mitigated deliberate homicide came in response to Question 2, "we cannot discern definitively whether the jury first acquitted Schmidt of deliberate homicide, or first convicted Schmidt of mitigated deliberate homicide." Opinion, ¶¶ 35, 38. This is incorrect. Question 1 asked the jury to decide the charge of deliberate homicide and provided a line for the verdict. The jurors were instructed to "[w]rite on the above line 'Guilty' or 'Not Guilty.'" Immediately below this, the jurors were instructed: "If you find the Defendant 'Guilty' of Deliberate Homicide, proceed to Question 3. If you find the Defendant 'Not Guilty' of Deliberate Homicide, proceed to Question 2." Question 2 asked the jury to decide the mitigated deliberate homicide charge. Question 3 asked the jury to decide the dangerous weapon allegation. Thus, pursuant to the instructions on the verdict form, and given that

25

"[w]e must presume that the jury followed the court's instruction," Opinion, ¶ 37, we can, in fact, discern definitively that the jury first wrote "Not Guilty" under Question 1 to the charge of deliberate homicide and then proceeded to Question 2, as instructed, and there wrote "Guilty" to the charge of mitigated deliberate homicide—the exact scenario which occurred in *Demontiney*. *See Demontiney*, ¶¶ 7, 20. But even setting aside the sequence in which the offenses were evaluated and decided, the fact remains that the jury still undisputedly acquitted Schmidt of deliberate homicide. The jury determined that Schmidt did *not* purposely or knowingly cause the death of James Correia.

¶80 Accordingly, our decision in *Demontiney* controls. *See Demontiney*, ¶¶ 8, 20-21 (concluding that the jury's verdict of "guilty to mitigated deliberate homicide but not guilty to deliberate homicide" was "logically impossible," and observing that "[w]e cannot imagine a much more prejudicial result to a defendant than a guilty verdict that is not logically possible"). As we held in that case and in *Scarborough*, there is no logical way the jury could find both that the defendant *did not* purposely or knowingly cause the death of another human being and that the defendant *did* purposely or knowingly cause the death of another human being, though under the influence of extreme mental or emotional stress. *Demontiney*, ¶ 16; *Scarborough*, ¶ 49. "[A] finding of guilt on deliberate homicide is a *precondition* to a finding of guilt on mitigated deliberate homicide"—a point which the State conceded. *Demontiney*, ¶ 17 (emphasis added).

¶81 Here, however, the jury did precisely what we said in *Demontiney* it could not logically do. It found that Schmidt *did not* purposely or knowingly cause the death of

26

Correia, but that Schmidt *did* cause Correia's death, though under the influence of extreme mental or emotional stress. As *Demontiney* states: " '[A] finding that the defendant satisfied the elements of deliberate homicide is a *prerequisite* to a conviction on the mitigated offense.' " *Demontiney*, ¶ 16 (quoting *Scarborough*, ¶ 48) (emphasis in *Scarborough*). To comply with this clear and unambiguous statement, the jury had to find Schmidt guilty of deliberate homicide *and* find that he acted under the influence of extreme mental or emotional stress.

¶82 The District Court not only failed to instruct the jury that it was required to find Schmidt guilty of deliberate homicide as a "precondition" or "prerequisite" to finding him guilty of mitigated deliberate homicide, the court actually directed the jury on the verdict form not to reach the charge of mitigated deliberate homicide unless it *first* found the defendant *not guilty* of deliberate homicide. In so doing, the court directly contradicted our holding in *Demontiney* and created the illogical scenario which required reversal in that case. And the jury did exactly as it was instructed on the verdict form. It did what we said was logically impossible in *Demontiney*. Regardless of who offered the verdict form (*see* Opinion, ¶ 40), it was ultimately *the court's* obligation to fully and fairly instruct the jury on the law. *State v. Archambault*, 2007 MT 26, ¶ 14, 336 Mont. 6, 152 P.3d 698. That it plainly failed to do.

¶83 I cannot agree that under the District Court's Instruction No. 25 and the verdict form, Schmidt was properly convicted of mitigated deliberate homicide. Indeed, he was acquitted

27

of that charge because the prerequisite finding of deliberate homicide was not made by the jury.

¶84 That said, I continue to be amazed that the Legislature leaves the "offense" of mitigated deliberate homicide on the books. Mitigated deliberate homicide is technically a stand-alone criminal offense—a felony punishable by imprisonment for a term of not less than 2 years or more than 40 years, and by a fine of not more than $50,000. Section 45-5-103(4), MCA. As noted above, to prove this offense the State must first prove that the defendant committed the offense of deliberate homicide, and then there must be "mitigating circumstances" which "reduce deliberate homicide to mitigated deliberate homicide." Section 45-5-103(3), MCA. Curiously, there does not have to be any "evidence" of mitigation; just "mitigating circumstances." Even more problematic, neither party has the burden of proving these "mitigating circumstances." Section 45-5-103(3), MCA. "Mitigating circumstances" are neither an "element" of the reduced crime provable by the State nor an "affirmative defense" provable by the defendant. Section 45-5-103(3), MCA.

¶85 So, under this scheme, a person accused and convicted of mitigated deliberate homicide can be deprived of his or her liberty by imprisonment for up to 40 years and of his or her property by a fine of up to $50,000. Yet, no one bears the burden of proving the "mitigating circumstances" which reduce a greater *offense* to a lesser *offense*. And, apparently, these "mitigating circumstances" are not even subject to proof beyond a reasonable doubt, as they are not an element of the crime charged, thus leaving mitigated deliberate homicide with only one actual "element"—the deliberate homicide. Moreover, as

28

a result of our decision today, the jury can actually acquit the defendant of the only statutory "element" contained within mitigated deliberate homicide—namely, deliberate homicide, i.e., "purposely or knowingly caus[ing] the death of another human being" (*compare* § 45-5-102(1)(a), MCA, *with* § 45-5-103(1), (3) MCA)—and yet, despite that acquittal, the jury can still find the defendant guilty of the offense of mitigated deliberate homicide, the only "element" of which is deliberate homicide. It is hard to envision a more nonsensical criminal offense.

¶86 To make matters worse, the Legislature has declared that mitigated deliberate homicide is "a lesser included offense" of deliberate homicide as defined in § 45-5-102(1)(a), MCA. *See* § 45-5-103(2), MCA. Elsewhere in the Code, "included offense" is defined as an offense that is "established by proof of *the same or less than* all the facts required to establish the commission of the offense charged." Section 46-1-202(9)(a), MCA (emphasis added); *see also State v. Meyer*, 2005 MT 215, ¶ 16, 328 Mont. 247, 119 P.3d 1214 (noting that the term "facts" in § 46-1-202(9)(a), MCA, refers to the statutory elements of the offense, not the individual facts of the case). Technically speaking, mitigated deliberate homicide is established by proof of "the same" statutory "elements" as deliberate homicide and, in this respect, is an "included offense." But this is only so because the Legislature has declared that mitigating circumstances (i.e., the facts the jury must find to "reduce" deliberate homicide to mitigated deliberate homicide) are not an "element" of mitigated deliberate homicide. Practically speaking, however, mitigated deliberate homicide cannot be a "lesser included offense" of deliberate homicide, given that the jury must find all

29

of the elements of deliberate homicide *plus* mitigating circumstances in order to find the defendant guilty of the mitigated offense.

¶87 And as if this weren't bad enough, the Legislature has directed that "[w]hen a lesser included offense instruction is given, the court shall instruct the jury that it must reach a verdict on the crime charged *before* it may proceed to a lesser included offense." Section 46-16-607(3), MCA (emphasis added). As noted, the verdict form in the present case followed this procedure. And yet, it is precisely this procedure which creates the logical impossibility we identified in *Scarborough* and *Demontiney*: " 'there is no logical way the jury could *acquit* on deliberate homicide and then consider mitigated deliberate homicide. To do so would require finding, first, that the defendant *did not* "purposely or knowingly cause the death of another human being" and, second, that he *did so* but only under the influence of extreme mental or emotional stress.' " *Demontiney*, ¶ 16 (quoting *Scarborough*, ¶ 49) (emphases in *Scarborough*).

¶88 In other words, the Legislature has created a situation in which a defendant, under the law as stated in the Montana Code Annotated, can *never* be convicted of mitigated deliberate homicide. First, deliberate homicide and mitigated deliberate homicide contain the exact same "elements" (no more, no less), and those are "purposely or knowingly caus[ing] the death of another human being." Sections 45-5-102(1)(a), -103(1), -103(3), MCA. Second, mitigated deliberate homicide is a "lesser included offense" of deliberate homicide. Section 45-5-103(2), MCA. Third, a jury must reach a verdict on the crime charged *before* it may proceed to a lesser included offense. Section 46-16-607(3), MCA. Fourth, since the

30

statutory "elements" of deliberate homicide and mitigated deliberate homicide are identical (as noted, "mitigated circumstances" are not an "element" of the mitigated offense, § 45-5-103(3), MCA), a verdict of not guilty on deliberate homicide necessarily means a verdict of not guilty on the "lesser included offense" of mitigated deliberate homicide. The jury simply cannot find first, as it is supposed to do under § 46-16-607(3), MCA, that the defendant *did not* "purposely or knowingly cause[ ] the death of another human being," § 45-5-102(1)(a), MCA (deliberate homicide), and then find second, again pursuant to the procedure in § 46-16-607(3), MCA, that the defendant *did* "purposely or knowingly cause[ ] the death of another human being," § 45-5-103(1), MCA (mitigated deliberate homicide). This statutory scheme could have been written by Rube Goldberg.[1]

¶89 Instead of perpetuating this absurdity, the next Legislature should simply dispose of the offense of mitigated deliberate homicide along with the notion that it is a lesser included offense of deliberate homicide. In its stead, to account for a homicide committed under the influence of extreme mental or emotional stress for which there is reasonable explanation or excuse (§ 45-5-103(1), MCA), the Legislature should create a new offense along the lines of manslaughter. *See e.g.* § 94-2507, RCM (1947) (defining voluntary manslaughter as the unlawful killing of a human being, without malice, upon a sudden quarrel or heat of passion). With this sort of statutory scheme, prosecutors could charge deliberate homicide and manslaughter in the same information as alternative offenses; the jury would be instructed as

---

[1] Rube Goldberg: "a comically involved, complicated invention, laboriously contrived to perform a simple operation." http://www.rubegoldberg.com/ (accessed Dec. 7, 2009) (citing *Webster's New World Dictionary*).

31

to the differing elements of each offense; and the jury could take their pick on the verdict form, depending on what actual evidence was proved beyond a reasonable doubt.

¶90 But if the Legislature chooses to retain the offenses of deliberate homicide and mitigated deliberate homicide, then where the jury is tasked with deciding which crime was committed, the jury should not be put in the position of having to render logically inconsistent verdicts on *both* deliberate homicide and mitigated deliberate homicide. Rather, the jury should be required to choose one or the other (or neither, if the defendant is not guilty of either charge). *See e.g. Demontiney*, ¶ 6 (noting that the State's verdict form, which advised the jury to enter a verdict to only one charge, was consistent with our holding in *Scarborough*). Alternatively, to eliminate any possibility of confusion or inconsistency, the following verdict form could be used:

1.      Did the defendant purposely or knowingly cause the death of another human being?

_____Yes    _____No   (Check one.)

If your answer is "Yes," then proceed to question 2. If your answer is "No," then do not proceed further; the foreperson should sign the verdict and return it to the bailiff.

2.      Did the defendant do so under the influence of extreme mental or emotional stress for which there is reasonable explanation or excuse?

_____Yes    _____No   (Check one.)

At least using this sort of verdict form would avoid the *Demontiney* problem and the one at issue here. The jury should not be required to render a verdict on both deliberate homicide and mitigated deliberated homicide as separate, stand-alone offenses.

¶91 Finally, it should be noted that in mitigated deliberated homicide, Montana's Legislature has created a stand-alone, felony criminal offense in which there can first be an outright acquittal on the only "element" of the offense, and then the balance of the jury's findings (whether the defendant acted under the influence of extreme mental or emotional stress for which there was reasonable explanation or excuse) are not subject to proof beyond a reasonable doubt by the government. This statutory scheme clearly violates the command of the Due Process Clause that an accused cannot be convicted of a crime "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970). Given the Legislature's seeming inability to rectify this situation and this Court's refusal to address the problem, Schmidt is left with no other resort except to the United States Supreme Court.

¶92 Pursuant to our controlling decision in *Demontiney*, I would vacate Schmidt's conviction and order him immediately released from confinement. *See Demontiney*, ¶ 28. I dissent from our failure to do so.

/S/ JAMES C. NELSON

Justice Patricia O. Cotter dissents.

¶93 I dissent from the Court's resolution of Issue Two. I would conclude that the District Court's failure to give an instruction on aggravated assault constitutes reversible error. I would reverse and remand this matter for a new trial.

33

¶94     It is undisputed that Schmidt and Correia ultimately ended up in a fight outside the Irish Times bar in Butte, and that Correia was on top of Schmidt and hitting him. It is further undisputed that Schmidt pulled a knife out of his pocket and stabbed Correia several times, resulting in his death. However, the evidence and argument was genuinely conflicting regarding who started this fight, what Schmidt's intentions were in stabbing Correia, and whether Schmidt was truly justified in fearing for his life. While the State maintained that Schmidt attacked Correia in the street, and that Schmidt was not being as badly beaten as he claimed, Schmidt asserted that Correia ambushed him and that he feared for his life. He insisted he never intended to kill Correia, but was rather trying to protect himself from the beating. There were witness accounts on both sides of this issue, and almost every witness who actually saw the fight had been drinking for awhile.

¶95     The State argued at trial that the stab wounds were inflicted with the intent to kill, citing the depth of the stab wounds to Correia. However, on Schmidt's cross-examination, the State's forensic expert Dr. Kemp essentially conceded that the depth of the wounds could have been due to Correia leaning into the knife as Schmidt stabbed him from below. This portion of the testimony reads as follows:

> Q.     But you did indicate that with respect to the wound in the leg that one of the potential causes could have been the individual himself moving; is that correct?
> A.     That is—yes. Based upon the features that I see in the stab wound, that's—it's consistent with somebody with the knife moving in orientation to the skin before it's removed or with the leg moving in orientation to the knife before it's removed. There's several possibilities there, yes.
> Q.     Now, you had indicated that, I believe, Wounds 1 and 2 were significantly impacted in the chest and the diaphragm area; is that correct?
> A.     Yes. Those were the two that penetrated into the chest cavity,

striking the diaphragm and the heart, yes.

Q.     With respect to the depth of those wounds, would it have been possible for someone leaning into the other individual to have those go deeper?

A.     Yeah, I mean, if somebody leans against a knife, it can drive the knife deeper into the body.  And it would help—yeah.  If that answered— yeah, I mean, if somebody's leaning forward onto something obviously sharp.  I mean if somebody just held a knife there and somebody leaned into it like that, once the knife goes through the skin, then it can go in.

¶96     In order to receive the aggravated assault instruction, Schmidt must only present enough evidence to arguably support a conviction of aggravated assault in lieu of deliberate homicide.  As this Court stated recently in *Adams v. State,* 2007 MT 35, 336 Mont. 63, 153 P.3d 601:

> A criminal defendant is entitled to jury instructions that cover an issue or theory if there is evidence to support such an instruction.  It is fundamental under Montana law that "a defendant is entitled to a jury instruction on a lesser included offense when one of the parties requests it and the record contains evidence from which the jury could rationally find the defendant guilty of the lesser offense and acquit of the greater."

*Adams*, ¶ 43 (quoting *State v. Beavers*, 1999 MT 260, ¶ 23, 296 Mont. 340, 987 P.2d 371).  In my view, given the conflicting evidence, Schmidt met this burden.

¶97     In ¶ 47 of the Opinion, the Court suggests that Schmidt could not receive an instruction on aggravated assault because Correia died.  However, in *State v. Castle*, 285 Mont. 363, 948 P.2d 688 (1997), we held, *as a matter of law*, that assault was a lesser included offense of deliberate homicide.  *Castle*, 285 Mont. at 368-69, 948 P.2d at 691.  In *Castle*, we reasoned as follows:

> At issue in this case, however, is whether the assault is an included offense under subsection 8(c). That subsection defines "included offense" as one that "differs from the offense charged only in the respect that a less

35

serious injury or risk to the same person, . . . or a lesser kind of culpability suffices to establish its commission." Section 46-1-202(8)(c), MCA. We addressed that statutory definition for the first time in [*State v. Fisch*, 266 Mont. 520, 881 P.2d 626 (1994)], where we held that under that subsection, an offense is a lesser included offense if it differs from the one charged *only* by way of a less serious injury *or* a less serious risk *or* a lesser kind of culpability. *Fisch*, 881 P.2d at 628.

> One commits the crime of deliberate homicide if he "purposely or knowingly causes the death of another human being." Section 45-5-102(1)(a), MCA. One commits assault if he "purposely or knowingly causes bodily injury to another." Section 45-5-201(1)(a), MCA. The only difference between the two is that a "less serious injury . . . suffices to establish" the crime of assault. Section 46-1-202(8)(c), MCA. This Court thus holds that under the express terms of subsection 8(c), assault is an included offense of the crime of deliberate homicide.

*Castle*, 285 Mont. at 368-69, 948 P.2d at 691. The Court's Opinion in this case is directly at odds with our reasoning in *Castle*, and indeed seems to implicitly overrule our holding in that case.

¶98 While admitting he stabbed Correia, Schmidt maintained all along that he did not intend to kill him. The forensic evidence of Correia's wounds did not foreclose this possibility. Thus, a jury could have rationally found Schmidt guilty of aggravated assault instead of deliberate homicide or mitigated deliberate homicide. This being so, the instruction on aggravated assault should have been given.

¶99 In this regard, the case sub judice is distinguishable from other cases in which the lesser included offense of aggravated assault was rejected in the context of a deliberate homicide charge. In *State v. Sellner*, 286 Mont. 397, 951 P.2d 996 (1997), for instance, the Court found that the defendant Sellner was not entitled to a lesser-included offense instruction on aggravated assault when he shot at an oncoming police officer, aiming for his

36

chest. *Sellner*, 286 Mont. at 402, 951 P.2d at 999. Sellner hit the officer, who would have died but for the fact that he was wearing a bullet-proof vest. The Court concluded that "[f]rom the evidence presented at trial, it would be irrational to conclude that Sellner's shooting of [Officer] Parcell in the chest with a large caliber soft-point bullet was done with any intent other than to cause a person's death." *Sellner*, 286 Mont. at 402, 951 P.2d at 999.

¶100 In *State v. Howell*, 1998 MT 20, 287 Mont. 268, 954 P.2d 1102, the defendant was convicted of attempted deliberate homicide. Howell had attempted to intervene in a fight between two individuals at his residence, and held a knife to one of the individual's (Oliver) throat telling him to get off the other person. *Howell*, ¶ 9. Howell ended up slitting Oliver's throat. *Howell*, ¶ 11. Howell requested an instruction on aggravated assault, which was refused by the district court. Howell challenged the refusal, and this Court affirmed. Howell had argued that he was entitled to the aggravated assault instruction because he didn't intend to kill Oliver, but rather accidentally slit his throat when Oliver fell on top of him and Howell pulled his arm away. *Howell*, ¶ 29. The Court rejected this argument as follows:

> [I]n this case, the testimony in the record and the medical evidence do not support an instruction on aggravated or felony assault. The injuries inflicted were nearly fatal. The laceration on Oliver's neck extended through skin, fat, and muscle and was within one millimeter of Oliver's carotid artery and jugular vein. Dr. Gould testified: "You could not get [a] more uniform [cut] without trying."
> **The record contains no evidence that Howell intended to inflict bodily injury rather than to cause the death of Oliver.** Howell admitted to threatening Oliver with a knife and testified at trial:
>> I was behind him but I put the knife to his throat and told him to get off, I hadn't used the knife. Listen, I like Jim Oliver, but when you threaten, you threaten, you show him you mean

37

> it or he's going to get up and kick the shit out of me.
> Howell then stated that he did not intend to injure Oliver, but cut him accidentally. This theory, if accepted, would support an acquittal, not a conviction for assault. Therefore, we hold that the District Court did not err in refusing to instruct the jury on aggravated or felony assault.

*Howell*, ¶¶ 33-34 (emphasis added).

¶101 Here, unlike the situation in *Howell*, Schmidt concedes he intended to stab Correia; he does not argue that the stabbing was *accidental*. Moreover, the forensic evidence arguably supports the theory that Schmidt's intent was to stab, but not to kill, Correia. The record in this case does contain evidence that Schmidt intended to inflict serious bodily injury rather than death. Accordingly, an assault instruction does find support in the facts and Schmidt's theory of events. Schmidt's theory, if believed, could result in a jury rationally convicting him of aggravated assault instead of deliberate homicide. Therefore, under *Adams*, I would conclude that Schmidt was entitled to a lesser included offense instruction to be able to fully present his theory to the jury. As a result of the District Court's failure to give the requested instruction, the instructions as a whole did not fully and fairly inform the jury of the applicable law. In my judgment, this error warrants reversal and a new trial. I therefore dissent.

/S/ PATRICIA O. COTTER